UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

TROY WRAGG, MICHAEL SCRONIC, LEONARD BOGDAN, and ELIEZER SOTO CONCEPCION, individually and on behalf of others similarly situated,

    Petitioners,

  v.

DAVID E. ORTIZ, Warden of the Federal Correctional Institution, Fort Dix and MICHAEL CARVAJAL, Director of the Federal Bureau of Prisons,

    Respondents.

Civil Action No. 20-05496(RMB)

**DECLARATION OF DR. NICOLETTA TURNER FOSTER**

I, Nicoletta Turner-Foster, M.D., do hereby declare, certify and state as follows:

1. I am employed by the United States Department of Justice, Federal Bureau of Prisons (BOP). I currently work as the Clinical Director at the Federal Correctional Institution ("FCI") Fort Dix, New Jersey. I have been employed by BOP since 2001.

2. In my position as the Clinical Director at FCI Fort Dix, I am responsible for coordinating comprehensive medical, dental, and mental health services of the highest quality while maintaining a clean, safe, and secure environment for nearly 4,000 inmates at both our FCI Low security institution as well

1

as our Federal Prison Camp (FPC) at Fort Dix. The Health Services Department is staffed by a comprehensive team of BOP and Public Health Service health care workers, accompanied by professional contract staff committed to providing the highest standards of professionalism and dedication to the inmate population.

3. With respect to COVID-19, specifically, I am involved on a daily basis in the identification, planning, and implementation of all Bureau directives for preventing the spread of COVID-19 at FCI Fort Dix including the Camp. Through this role, I have knowledge of both the Bureau's national directives relating to COVID-19 and the additional steps that FCI Fort Dix, specifically, has taken to combat COVID-19 within the facility. Accordingly, through the course of my official duties, I have personal knowledge regarding the numerous measures, discussed below, that have been implemented both Bureau-wide and at FCI Fort Dix in order to prevent and manage the spread of COVID-19.

**I.   NATIONAL STEPS TAKEN**

4. Prior to discussing the measures taken at FCI Fort Dix, I will first discuss the measures taken throughout the BOP. In January 2020, the Bureau began Phase One of its Action Plan for COVID-19. Phase One activities included, among other things, seeking guidance from the BOP's Health Services Division

regarding the COVID-19 disease and its symptoms, where in the United States infections were occurring, and the best practices to mitigate its transmission. See https://www.bop.gov/resources/news/20200313_covid-19.jsp. In addition, an agency task force was established to begin strategic planning for COVID-19 Bureau-wide. This strategic planning included building on the Bureau's existing procedures for pandemics, such as implementing its pre-approved Pandemic Influenza Plan. From January 2020 through the present, the Bureau has been coordinating its COVID-19 efforts with subject-matter experts both internal and external to the agency, including implementing guidance and directives from the World Health Organization (WHO), the Centers for Disease Control and Prevention (CDC), the Office of Personnel Management (OPM), the Department of Justice (DOJ), and the Office of the Vice President. See https://www.bop.gov/resources/news/20200313_covid-19.jsp.

**Action Plan for COVID-19, Phase Two**

5.   On March 13, 2020, the Bureau implemented Phase Two of its Action Plan.  Phase Two put into place a number of restrictions across all Bureau facilities over a 30-day period, to be re-evaluated upon the conclusion of that time period. Specifically, the Bureau suspended the following activities for an initial period of 30 days, with certain limited exceptions:

3

social visits; legal visits; inmate facility transfers; official staff travel; staff training; contractor access; Volunteer visits; and tours.

6. During Phase Two, inmates were subjected to new screening requirements. Specifically, all newly arriving Bureau inmates were screened for COVID-19 symptoms and "exposure risk factors," including, for example, if the inmate had traveled from or through any high-risk COVID-19 locations (as determined by the CDC), or had had close contact with anyone testing positive for COVID-19. Asymptomatic inmates with risk of exposure are placed in quarantine. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.

7. All staff were also subjected to enhanced health screening in areas of "sustained community transmission," as determined by the CDC, and at medical referral centers. The enhanced screening measures required all staff to self-report any symptoms consistent with COVID-19, as well as any known or suspected COVID-19 exposure, and further required all staff to have their temperature taken upon entry into any Bureau facility. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis

4

alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

8.   Finally, in addition to the measures listed above, the Bureau implemented national "modified operations" in order to maximize social distancing within Bureau facilities. These modifications included staggered meal and recreation times in order to limit congregate gatherings. Additionally, the Bureau established a set of quarantine and isolation procedures for known or potential cases of COVID-19.

**Action Plan for COVID-19, Phase Three**

9.   On March 18, 2020, the Bureau implemented Phase Three of the COVID-19 Action Plan for Bureau locations that perform administrative services (i.e., non-prison locations), which followed DOJ, Office of Management and Budget, and OPM guidance for maximizing telework. In this phase, individuals who had the ability to telework and whose job functions did not require them to be physically present were directed to begin teleworking.

10.   Additionally, as part of this phase, and in accordance with the Pandemic Influenza contingency plan, all cleaning, sanitation, and medical supplies were inventoried.

**Action Plan for COVID-19, Phase Four**

11.   On March 26, 2020, the Bureau implemented Phase Four of its Action Plan. In Phase Four, the Bureau revised its preventative measures for all institutions. Specifically, the

5

agency updated its quarantine and isolation procedures to require all newly admitted inmates to the Bureau, whether in areas of sustained community transmission or not, to be assessed using a screening tool and temperature check (further explained below). This screening tool and temperature check applied to all new intakes, detainees, commitments, prisoners returned on writ from judicial proceedings, and parole violators, regardless of their method of arrival. Thus, all new arrivals to any Bureau institution—even those who were asymptomatic—were placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates were placed in isolation until they tested negative for COVID-19 or were cleared by medical staff as meeting CDC criteria for release from isolation.

**Action Plan for COVID-19, Phase Five**

12. On March 31, 2020, the Director of the Bureau ordered the implementation of Phase 5 of its COVID-19 Action Plan, which took effect on April 1, 2020. Specifically, the Director ordered the following steps to be taken:

    a. For a 14-day period, inmates in every institution will be secured in their assigned cells/quarters to decrease the spread of the virus.

    b. During this time, to the extent practicable, inmates should still have access to programs and services

offered under normal operating procedures, such as mental health treatment and education.

    c. In addition, the Bureau is coordinating with the United States Marshals Service (USMS) to significantly decrease incoming movement during this time.

    d. After 14 days, this decision will be re-evaluated and a decision made as to whether or not to return to modified operations.

    e. Only limited group gathering will be afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Computer System (TRULINCS) access.

    f. Provided inmates access to programs and services offered under normal operating procedures, such as mental health treatment and education.

    g. In addition, the Bureau coordinated with the United States Marshals Service (USMS) to significantly decrease incoming movement during this time.

    h. All staff and inmates were issued an appropriate face covering and strongly encouraged to wear the face covering when in public areas when social distancing cannot be achieved.

    i. Contractor access to BOP facilities is restricted to only those performing essential services (*e.g.*, medical

or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

    j.   Social and legal visits were stopped as of March 13, 2020, and remain suspended until at least May 18, 2020, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols in place for prison staff, contractors, and visitors.

    k.   Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

13.   At FCI Fort Dix, during Phase Five, commissary items, laundry, recreation materials, education materials, and psychology services were delivered directly to inmates housing

8

units. Feeding is done by grab-and-go meals, housing unit by housing unit. Pill line and sick call triage are done simultaneously during the grab-and-go meal time-frame, again, unit-by-unit. At FCI Fort Dix, inmates were otherwise locked in their housing unit for the remainder of the day and are never mingling with inmates from other housing units. As of May 18, 2020, inmates will be permitted a short outdoor recreation time in front of their housing unit, two days per week. Inmates will not mingle with inmates from other housing units during the recreation period.

**Action Plan for COVID-19, Phase Six**

14. On April 13, 2020, the Director of the Bureau ordered the implementation of Phase 6 of its COVID-19 Action Plan. Specifically, the Director ordered an extension of the nationwide action plan in Phase 5, which applies to medical screening, limited inmate gathering, daily rounds, limited external movement, and fit testing, until May 18, 2020. Phase Six has been implemented at FCI Fort Dix.

**II. STEPS TAKEN AT FCI FORT DIX TO ADDRESS COVID-19**

15. The FCI Fort Dix Clinical Staff consists of 4 Physicians, 10 Mid-Level Providers, 11 Registered Nurses, 2 Infection Control/Improving Performance Nurses, and 2 Medication Technicians, as well as 4 Pharmacists, 3 Dentists, and 2 Dental Hygienists. The Health Services Department is accredited by The

Joint Commission (JC), the American Correctional Association (ACA) and the Accreditation Association for Ambulatory Health Care (AAAHC).

16. In addition to the steps taken at the national level, FCI Fort Dix itself has also taken a number of additional measures in response to the COVID-19 pandemic, including providing inmate and staff education; conducting inmate and staff screening; putting into place testing, quarantine, and isolation procedures in accordance with Bureau policy and CDC guidelines; ordering enhanced cleaning and medical supplies; and taking a number of other preventative measures.

17. From the outset of the COVID-19 pandemic, FCI Fort Dix officials have provided regular updates to inmates and staff regarding the virus and the Bureau's response, and have educated inmates and staff regarding measures that they themselves should take to stay healthy. Since March 2, 2020, the Warden has posted guidance to inmates through the TRULINCS electronic messaging system more than five times. Topics have included CDC guidance on COVID-19 and proper handwashing, how to stop the spread of germs, and proper sanitation. On March 25, 2020, written guidance was posted inside of housing units. Staff have also been educated through informational e-mails.

18. Starting on March 16, 2020, all staff and necessary contractors entering the confines of the institution had to

complete a medical questionnaire and temperature check. This practice is still currently being utilized. Staff with any symptoms or fever are sent home by medical staff.

19. At the onset of the pandemic, staff were also encouraged to be "fit tested" for N-95 masks which are necessary for entry to the isolation unit and escorted outside medical trips to other facilities.

20. Any and all new inmates coming in to FCI Fort Dix are also screened for any fever or symptoms. They are placed in an automatic 14-day quarantine in a specifically designated housing unit (only for these inmates) prior to release to their assigned housing unit.

21. With respect to healthcare procedures for the Low facility, all inmates have temperature checks and a symptom assessment every other day (East and West Compounds alternate days). In order to minimize the movement of inmates, sick call slips are being distributed in the housing units. The inmate will then be triaged at the daily Pill Line (for inmates necessitating non-self-carry medication). Inmates with COVID symptoms are seen immediately. Others are scheduled for a later appointment. The appointments are still handled in the Health Services building; however, the appointments are scheduled by housing unit and are limited to approximately 20 inmates so that they can socially distance in the Health Services building.

11

Pill Line is conducted while inmates are obtaining their grab-and-go meal. Pill line is conducted one unit at a time, again to minimize cross contamination between inmates and housing units.

22. From the outset, in accordance with CDC guidance, quarantine and isolation areas were established for the institution. Based on the outbreak of COVID-19 at the Camp (discussed further below), and the need for a larger isolation area, the decision was made to make housing unit 5851 in the Low security institution, the isolation unit. There was no separated area large enough in the Camp to complete this task. The second floor of Unit 5851 are positive inmates and the third floor are inmates in recovery, soon to be released back to general population. FCI Fort Dix does not plan to consolidate inmates (at either the Low or the Camp) with preexisting medical conditions into a single space. It is safer to spread those inmates out across the institution

23. In April 2020, the institution obtained an FDA approved rapid Abbott testing machine which allows us to test approximately 75 inmates in a 24/hour period (based on the length of the test). Prior to obtaining the Abbott testing machine, the institution utilized send-out testing. The Abbott tests take approximately 20 minutes per inmate, and provide immediate results. To date, no inmate at FCI Fort Dix Low has

12

tested positive for COVID-19. If an inmate were to exhibit symptoms of the virus or report symptoms of the virus, he immediately would be escorted to the Health Services building and examined by a clinician. If COVID-19 is suspected, he would be tested immediately using the Abbott machine. If the inmate tested positive, he would be immediately isolated in Unit 5851. To date, one LOW inmate has been tested for COVID-19 based on symptoms and after examination by a clinician. He tested negative. FCI Fort Dix currently has no plan to test the entire Low, but it has testing capacity and supplies to address issues if they arise. Because it takes 20 minutes to administer, BOP can conduct approximately 75 tests in a 24-hour period day. Moreover, the institution currently has 432 Abbott test kits available. We are expected to obtain approximately 250 test kits per week for the near future. This would allow us to test an entire housing unit in the Low institution if necessary, although this process would take approximately one week.

    24. As of April 5, 2020, all inmates and staff were provided surgical masks. On April 16, 2020, staff and inmate masks became mandatory. Staff and inmates were issued a weekly supply of surgical masks. During the week of April 29, 2020, inmates and staff were supplied three reusable cloth masks. Inmate masks are washed twice weekly by Laundry staff. Staff were issued guidance by way of e-mail on how to use and wash the

13

masks. Inmates are encouraged routinely to maintain sanitation and social distancing. Staff have also been issued a continual supply of surgical masks, and during the last week of April, staff were also provided two cloth masks.

### III. PRISON CAMP SPECIFICS

25. The first Camp inmate tested positive for COVID-19 on April 3, 2020. The inmate was immediately isolated upon showing of symptoms, and twice daily temperature checks were initiated at the Camp. Inmates showing symptoms of the virus, or reporting symptoms of the virus were also isolated and tested. The Camp was also made a Quarantine Unit, meaning any staff member entering the Unit had to don PPE including surgical mask, gown, face shield, goggles and gloves. In the Camp, all services are provided inside the Unit including Food Service, Medical, Psychology, Education, and Commissary.

26. Based on the discovery of COVID-positive inmates in the Camp, the BOP deployed the Abbott test machine to our institution so that we could rapidly test a larger number of inmates at the institution. Based on the positive inmates at the Camp, and in an effort to decrease the population at the Camp to assist in social distancing efforts, a decision was made to place all COVID-19 positive inmates in 5851. The decision was also made to test all inmates eligible for release under the CARES Act, and then house them in a separate housing unit, 5735.

14

As of today's date, 35 inmates are housed in Unit 5735.

27. As of today's date, 259 COVID-19 tests have been administered, which includes testing of the entire Camp population. Of those tests, 58 inmates tested positive for COVID-19 from the minimum security Camp. Currently, 22 inmates remain in isolation in Unit 5851 and 27 are on the third floor in recovery, pending return to the Camp. Inmates are moved to the recovery floor after a period of isolation for 10 days and symptom free. Staff entering this housing unit are limited to essential staff and must wear full protective PPE including N-95 mask, face shield, a gown and gloves. One inmate was hospitalized based on COVID-19 symptoms. He was never intubated and has since returned to the institution. He has twice tested negative and is in the recovery unit. No other inmates have been hospitalized with COVID-19 complications, and a number of the inmates are completely asymptomatic.

28. Currently only inmates verified negative to the COVID-19 virus are housed at the Camp, a total of 124 inmates. This number provides sufficient space for the inmates to social distance.

**IV. PETITIONER SPECIFICS**

29. Inmate Wragg, Reg. No. 67165-019, is a 38-year old inmate with a history of hypertension, hyperlipidemia, seizure disorder and schizoaffective disorder. His medical conditions

15

are well-controlled with medication; however, his medical conditions do put him in the high risk group if he were to contract COVID-19.

30. Inmate Scronic, Reg. No. 79605-054, is a 49-year old inmate with a history of hypertension, depression, and basal cell carcinoma for which he was treated with radiation and chemotherapy. Based on his history of skin cancer, he is at a higher risk if he contracts COVID-19. Because inmate Scronic is a Camp inmate, he was tested using the Abbott testing machine and he is negative for the COVID-19 virus.

31. Inmate Bogdan, Reg. No. 07918-088, is a 68-year old inmate with a history of high BMI, hypertension, hyperlipidemia, chronic GERD, back pain, and chronic exertion shortness of breath. His medical conditions are well-controlled with medication; however, his medical conditions do put him in the high risk group if he were to contract COVID-19.

32. Inmate Soto-Concepcion, Reg. No. 72850-067, is a 38-year old inmate with a history of Myocardial Infraction (twice), hypertension, and hyperlipidemia. His conditions are stable; however, his conditions do put him in the high risk group were he to contract COVID-19. Because inmate Soto-Concepcion is a Camp inmate, he was tested using the Abbott testing machine and he is negative for the COVID-19 virus.

## V. CONCLUSION

33.     In sum, the Bureau and FCI Fort Dix has taken the COVID-19 pandemic extremely seriously and have implemented numerous measures to proactively combat the spread of this disease to staff members and the inmate population. The various phases of the Bureau's Action Plan have been designed and implemented in a systemic manner both nationally and at FCI Fort Dix in order to mitigate the spread of COVID-19.  In addition to the steps taken at the national level, FCI Fort Dix itself has taken a number of measures to increase social distancing in a prison environment and to prevent the spread of COVID-19 in the Camp and Low institution.

> I declare that any and all records attached
> to this declaration are true and accurate
> copies maintained in the ordinary course of
> business by the Federal Bureau of Prisons.
> I further declare that the foregoing is true
> and correct to the best of my knowledge and
> belief, and is given under penalty of perjury
> pursuant to 28 U.S.C. § 1746.

*N. A. Turner-Foster, MD, CD*          05/18/2020
Nicoletta A. Turner Foster, M.D.       Date
Clinical Director
FCI Fort Dix

17